OPINION
{¶ 1} This appeal arises from the Portage County Court of Common Pleas, wherein appellant, Mark A. Miller ("Miller"), was convicted of one count of intimidation of a public servant and one count of retaliation.
 {¶ 2} The following facts are relevant to this appeal and were presented at trial. Miller, his wife, and four children moved into their home in Streetsboro, Ohio, in 1997. Living in the adjacent residence were the Strasshofers and their children, who had moved to the neighborhood in 1995. Almost immediately after the Miller family moved in, acrimony developed between the two families. According to trial testimony, the Strasshofers contacted the Streetsboro Police Department approximately twenty times within the first two years of the Millers moving into the neighborhood. The Strasshofers complained of loud music, loud cars, noisy parties, and stray dogs. Mrs. Strasshofer ("Sylvia") worked as a supervisor for the Portage County Child Support Enforcement Agency ("CSEA"). In January 2001, Sylvia noted that an automatic alert had been issued throughout the state child support computer network concerning Miller. Miller had fallen behind in his child support payments for a child from a previous relationship. In her official capacity at CSEA, Sylvia became aware of this situation. She was also aware that Miller had reported to CSEA that he was unemployed. Living directly adjacent to the Millers, Sylvia noticed Miller enter and exit a "Mueller Tree Service" truck on a regular basis, and that the truck remained parked in the Millers' drive.
 {¶ 3} Sylvia alerted her immediate supervisor, Phil King ("King"), the manager of CSEA. King included Miller in a list of CSEA obligors to be investigated for attempting to hide income. King enlisted the services of Timothy Moon ("Moon") to conduct a prosecutorial investigation of Miller and discern his employment status. King and Sylvia agreed that she should remove herself from the investigation at that point. Moon proceeded to follow Miller to and from various job sites and recorded Miller removing trees for the tree service. Moon ultimately turned over the results of his investigation to CSEA, and Linda Pantalone ("Pantalone") was designated as the caseworker for the matter. CSEA issued administrative subpoenas to Miller and his alleged employer regarding Miller's employment status as well as his failure to report income to CSEA. Interviews of Miller and Matthew Mueller ("Mueller"), owner of Mueller's Tree Service, were conducted at CSEA on March 5, 2002, by Pantalone.
 {¶ 4} It was during this time when the CSEA investigation was being conducted that a series of alleged incidents occurred between Miller and the Strasshofers. Sylvia testified to the following at trial. First, on October 11, 2001, Miller swerved his truck at the Strasshofers while they were walking their dog along the road and yelled, "[y]ou fucking old goats." The second incident occurred on October 20, 2001, when Miller yelled at the Strasshofers across their privacy fence while they were in the backyard. The next incident occurred on May 3, 2002, where Miller yelled "fuck you" to Sylvia and "gave her the finger" as she was stopped at a stop sign near their homes. The fourth incident occurred on May 26, 2002, when Miller continued to yell obscenities at the Strasshofers while they were in their backyard.
 {¶ 5} Another incident occurred on August 11, 2002, when Miller spat toward Sylvia as she was walking her dog along the road. The two couples also got into a verbal altercation while attending a function at the local elementary school for their children.
 {¶ 6} On August 30, 2002, an incident occurred that served as the basis for the felonious assault charge. On that date, Miller allegedly swerved his truck across the center line toward Sylvia's oncoming car, which forced her off the road and into the grass along the road.
 {¶ 7} On September 20, 2002, the Strasshofers found a life insurance flyer on the front steps of their home. Finally, the Strasshofers alleged Miller threw rocks through the front windows of their home.
 {¶ 8} On October 17, 2002, the grand jury indicted Miller on one count of felonious assault, a felony of the second degree; one count of intimidation of a crime victim or witness, a felony of the third degree; and one count of retaliation, a felony of the third degree. The charges named Sylvia as the victim. Miller pled not guilty and was released on bond awaiting trial.
 {¶ 9} Defense counsel filed a motion for a bill of particulars in order to get more specificity with respect to the events in question. The time period set forth in the indictment ran from January 1, 2001 through September 23, 2002. The state responded with a written bill of particulars, and the matter was set for a jury trial on June 10, 2003.
 {¶ 10} Prior to trial, the state returned to the grand jury, seeking to amend the original indictment. The grand jury subsequently reindicted Miller for intimidation of a public servant on May 30, 2003, rather than intimidation of a crime victim or witness.
 {¶ 11} Miller filed a notice of alibi for the date of August 30, 2002, the date that he allegedly swerved his truck into the path of Sylvia's oncoming car, which led to the felonious assault charge. Miller asserted that he was at his worksite at the time the incident allegedly occurred. The jury trial was subsequently continued until early 2004.
 {¶ 12} The state also indicted Miller in a separate case, charging him with one count of intimidation of a crime victim or witness, a felony of the third degree. The victim in that separate case was Mueller, Miller's employer.
 {¶ 13} The trial court elected to allow the two cases to proceed to trial together as the two crimes were interrelated and shared the same factual predicate. The cases proceeded to trial on March 31, 2004. The state called a number of witnesses to testify including: the Strasshofers, Mueller, and Officer Troy Beaver of the Streetsboro Police Department. At the close of the state's case, defense counsel moved for a Crim.R. 29 judgment of acquittal. The motion was denied. The defense called a number of witnesses to the stand in its case-in-chief, including: Miller, his wife, and other family members and coworkers.
 {¶ 14} On April 2, 2004, the jury convicted Miller on one count of intimidation of a public servant and the retaliation charge related to Sylvia. He was acquitted of the felonious assault charge against her, and was also acquitted of the intimidation charge against Mueller.
 {¶ 15} The matter came on for sentencing on June 14, 2004. The trial court imposed a prison term of one year with regard to each conviction, to be served concurrently. Miller presents six assignments of error on appeal. The first assignment of error is:
 {¶ 16} "The trial court committed reversible error by allowing the prosecutor to introduce certain testimony regarding appellant's prior misdemeanor convictions as substantive evidence and failing to instruct the jury that such convictions are to be considered solely for impeachment."
 {¶ 17} Miller's second assignment of error is:
 {¶ 18} "Defendant-appellant was deprived of his constitutional right to a fair trial by virtue of the trial court's admission of irrelevant and improper evidence that was intended solely to denigrate appellant's character in the eyes of the jury and give the impression that he is a bad person."
 {¶ 19} In his first and second assignments of error, Miller contends the trial court erred in admitting evidence concerning his prior misdemeanor convictions as well as impermissible evidence regarding his character. Specifically, Miller takes issue with the testimony of his neighbor, Mr. Strasshofer, concerning Miller's prior misdemeanor record. On direct, cross, and redirect examination Mr. Strasshofer testified concerning the acrimonious relationship between the Millers and Strasshofers. On direct examination, the questioning began with a description of the disturbances arising from the Miller property that led to the multiple calls to the Streetsboro Police Department by the Strasshofers. Mr. Strasshofer described the loud music, parties, dogs, and loud cars that served as a constant nuisance. After this testimony, the prosecutor began questioning Mr. Strasshofer about subsequent misdemeanor convictions that arose. The following colloquy occurred during redirect examination:
 {¶ 20} "PROSECUTOR: Mr. Strasshofer, [Miller's counsel] has brought up a few things regarding the unlawful noise complaints that you filed against Mr. Miller, is that correct?
 {¶ 21} "WITNESS: Yes.
 {¶ 22} "Q: He was in fact convicted of that, is that correct?
 {¶ 23} "A: Correct
 {¶ 24} "Q: And I have a journal entry here. Take a look at that. Are you familiar with that?
 {¶ 25} "A: I've never seen this before, but I'm familiar with the dates.
 {¶ 26} "Q: He was indeed found guilty of loud noise by Judge Barbara Watson, is that correct?
 {¶ 27} "A: Correct.
 {¶ 28} "Q: And in terms of the menacing that you filed —
 {¶ 29} "A: Correct.
 {¶ 30} "Q: — or that was filed against Mr. Miller, that was in '99, is that correct?
 {¶ 31} "A Correct.
 {¶ 32} "Q: He was found guilty of reduced charges of disorderly conduct, is that correct?
 {¶ 33} "A: Correct.
 {¶ 34} "Q: I'll ask you to look at this.
 {¶ 35} "A: Again, I've never seen this, but —
 {¶ 36} "Q: Do you remember him being found guilty?
 {¶ 37} "A: Yes.
 {¶ 38} "Q: That's signed by Judge Pittman.
 {¶ 39} "A: Yes."
 {¶ 40} The preceding line of questioning is offensive for several reasons. First, it must be acknowledged that it is the state, rather than Mr. Strasshofer, that does the majority of the testifying regarding the convictions via the leading questions. The witness simply confirms the prosecution's testimony. The state also repeatedly directs the witness' attention to "journal entries" of conviction concerning the misdemeanor offenses despite the witness acknowledging more than once that he had never seen the "journal entries." Moreover, the trial court admitted the "journal entries" as exhibits to be reviewed by the jury during deliberations. Most important of all is the fact that the misdemeanor convictions in question have no bearing on the current offenses and serve only as impermissible evidence of Miller's prior bad acts.
 {¶ 41} While this colloquy may be the most conspicuous example of the state crossing the line into the realm of inadmissible evidence, it is argued by the state that, in fact, Miller had previously opened the door to this testimony about prior convictions. In its brief, the state argues, "[t]his court's attention is directed to the fact that counsel for appellant, in his previous cross-examination of this witness, had asked the witness about a `half dozen complaints,' having to do with menacing complaints in 1999, a loud music complaint, and a conviction for permitting a dog to run at large." Having opened up this area in cross-examination, according to the state's argument, the prosecutor was then permitted to ask follow up questions, which referenced specific "journal entries" reflecting convictions for the charges just mentioned.
 {¶ 42} Further, with regard to the testimony of subsequent witnesses who testified regarding Miller's prior conviction for domestic violence, the state argues that this was "invited error" by Miller, brought on by his overall strategy to test the credibility of the Strasshofers by matching Miller's willingness to disclose the prior incidents involving the Strasshofers versus the Strasshofers' unwillingness to accept any responsibility for their part in any of the neighbor disputes.
 {¶ 43} A review of the record, however, reveals that long before Mr. Strasshofer testified about "journal entries," the door had been opened wide by the state with testimony about prior bad acts and specific instances of conduct. Under Evid.R. 608(B), such specific instances of conduct could not have been proven by means of extrinsic evidence, but the state nevertheless proceeded to attempt to prove them.
 {¶ 44} Specifically, after Pantalone, a child support investigator, had finished testifying for the state on direct examination concerning her investigation into Miller's child support matter, the prosecutor asked her the open-ended question, "[n]ow, did anything unusual happen after you left the Courthouse?" In reply, she testified that she believed it was Miller who cracked her windshield with a rock while she was inside the juvenile court on the day in question, though she admittedly had no evidence of his involvement, nor was he ever charged with this incident.
 {¶ 45} After Pantalone testified, the next witness, Sylvia, stated that she believed it was Miller who threw a rock through her window on one occasion, and that it was Miller who put a life insurance flyer on her front steps. Again, there was no evidence offered in support of these other prior bad acts to link Miller with these events, nor did any charges issue with respect to them.
 {¶ 46} Thus, by the time the state got to Mr. Strasshofer's testimony, the record was already replete with prior bad acts testimony and specific instances of bad conduct. After his testimony, the trial evolved into a "piling on" by the state of prior bad acts testimony. In this vein, testimony was elicited from five separate witnesses, all of whom mentioned Miller's arrest for domestic violence in July 1998. Also, his employer, Mueller, was asked on direct examination by the state about allegations of grand theft and tax evasion, having to do with Miller allegedly cashing company checks without proper authorization and, then, not reporting the income to the IRS. Of course, there were no charges of grand theft or tax evasion pending before the court. Thus, a review of the record as a whole reveals that whatever may have resulted from Miller's counsel mentioning a "half dozen complaints" in his cross-examination of Mr. Strasshofer, the thrust of the state's case was to elicit as much testimony about prior bad acts and specific instances of bad conduct as possible, starting at the inception of the trial and continuing to its conclusion.
 {¶ 47} We also dismiss the notion that Miller's actions constituted "invited error," as the state has argued in its brief. Under the "invited error" doctrine, "a party is not entitled to take advantage of an error that he himself invited or induced."[1] We need not decide whether there was "invited error" by Miller or his counsel, for two reasons. First of all, in our discussion below we come to the conclusion that there was ineffective assistance of counsel. Therefore, Miller cannot have it both ways: we do not accept that Miller foisted "invited error" on the proceedings below, and, at the same time, claim that his counsel was ineffective: "[t]here is no point in having a stringent invited error doctrine only to allow it to be overcome by finding counsel ineffective for having invited the error."[2]
 {¶ 48} Secondly, even if there were instances of "invited error," an "invited error" "involves the exercise of trial strategy, and the courts have repeatedly held that an appellate court will not question matters of trial strategy."[3]
 {¶ 49} The fact that defense counsel failed to raise an objection to the admission of Miller's prior convictions and bad character subjects these alleged errors to a plain error analysis.[4] To survive a plain error analysis, there must be an error or deviation from a legal rule; the error must be plain in that it is an obvious defect in trial proceedings; and it must have affected substantial rights of the defendant.[5]
 {¶ 50} Concerning the prior misdemeanor convictions, the state contends that it was in fact the defense that raised the issue concerning the "half dozen complaints" the Strasshofers filed against Miller. We are not persuaded by this contention. Although the defense addressed the prior police summoning, it was the state that, through leading questions, testified regarding the actual convictions through the "journal entries."
 {¶ 51} Miller also contends that the trial court erred in admitting evidence concerning other instances of his bad behavior. For example, Pantalone, the CSEA caseworker, was permitted to testify concerning an incident during the Miller investigation. After a CSEA hearing had been held, she noted that Miller exited the courthouse before her. She arrived outside shortly afterward to find the windshield on her truck cracked. She testified that she suspected Miller of the act, although evidence of Miller's involvement was never obtained and charges were never filed.
 {¶ 52} Miller also takes issue with the testimony, through multiple witnesses, concerning his prior domestic violence arrest regarding his wife. These charges were ultimately dismissed. This evidence came in through the testimony of another neighbor, Monica Hayes ("Hayes"). Hayes testified that she knew the police had been called to the Millers' house in the past. The state asked Hayes whether she was aware that Mrs. Miller had filed a domestic violence charge against Miller in the past, to which Hayes responded in the negative.
 {¶ 53} The state attempted to bring in the past domestic violence arrest through the questioning of Miller's father and whether he was aware of the arrest. The state also questioned Officer Beaver of the Streetsboro Police Department. He was asked whether he personally responded to the domestic violence call. Additionally, the state questioned Mrs. Miller regarding the reason for filing the domestic violence charge, and whether Miller had struck her. Finally, the state questioned Miller regarding whether he had hit his wife on the day the domestic violence arrest was made.
 {¶ 54} It should be noted that defense counsel failed to object to any of this questioning. Throughout this questioning, the state was attempting to paint Miller in a bad light to the jury. The prior domestic violence arrest has no relationship to the current charges that were before the jury.
 {¶ 55} The trial court also permitted Mueller, Miller's employer, to testify regarding his feeling that while Miller was working for him for cash and evading CSEA, he had also been embezzling over $100,000 from the business. Mueller further testified that Miller had threatened and intimidated him into corroborating Miller's notice of alibi concerning the time period in which the alleged felonious assault took place.
 {¶ 56} All of the foregoing testimony, including the prior misdemeanor convictions, the prior incident regarding Pantalone, the prior domestic violence arrest, and the embezzling allegations were presented to the jury solely to demonstrate Miller's bad character. Evid.R. 403 prohibits the admission of evidence, albeit relevant, if its probative value is substantially outweighed by the danger of unfair prejudice. However, the evidence presented in the instant case does not rise to the level of "relevant evidence" as defined in Evid.R. 401. Relevant evidence is that which has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."[6]
 {¶ 57} The prejudicial nature of the foregoing evidence is compounded by the fact that the trial court failed to issue a jury instruction that such bad acts were to be considered by the jury solely for impeachment purposes. In the absence of such an instruction, the jury is left with a large body of inadmissible evidence concerning Miller's character, copies of "journal entries" admitted into evidence, and no cautionary instruction. We conclude that the evidence and testimony in the record satisfy the three-prong requirement of plain error. Based on the foregoing, the trial court committed reversible error in admitting the highly prejudicial evidence against Miller.
 {¶ 58} Miller's first and second assignments of error are with merit.
 {¶ 59} Miller's third assignment of error is:
 {¶ 60} "Defendant-appellant was denied the effective assistance of trial counsel as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution."
 {¶ 61} In his third assignment of error, Miller contends that he was deprived of the effective assistance of counsel at trial. In order to demonstrate ineffective assistance of trial counsel, the defendant must show that trial counsel's performance was deficient in that the representation fell below an objective standard of reasonableness.[7] Secondly, it must be shown that the deficient performance was prejudicial to the defendant.[8]
 {¶ 62} In the instant case, defense counsel failed to object to the large body of impermissible testimony regarding prior bad acts, prior misdemeanor convictions, and prior arrests. We conclude that the numerous instances of impermissible testimony and the varied types of highly prejudicial prior bad acts, without a single objection by defense counsel, rise to the level of deficient performance on the part of trial counsel. The secondStrickland prong, requiring prejudice, is also met here, as the jury was permitted to hear a myriad of allegations and prior bad acts without objection by defense counsel. The jury was left to conclude that Miller was a highly volatile individual with numerous prior bad acts upon which the jury could infer Miller's guilt on the current charges.
 {¶ 63} Therefore, based on the foregoing, we conclude Miller was deprived of the effective assistance of counsel in the instant case.
 {¶ 64} Miller's third assignment of error is with merit.
 {¶ 65} Miller's fourth assignment of error is:
 {¶ 66} "The state produced insufficient evidence to support defendant-appellant's convictions for intimidation of a public servant and retaliation against a public servant."
 {¶ 67} Miller moved for acquittal pursuant to Crim.R. 29 at the conclusion of the state's case, but he failed to renew his motion at the conclusion of all the evidence. A split of authority exists on whether he is permitted to argue insufficiency of the evidence where he has not renewed his Crim.R. 29 motion.[9] For purposes of this review, we will consider that Miller has not waived his right to challenge the sufficiency of the evidence.
 {¶ 68} The assertion of insufficient evidence challenges whether the state presented evidence on each element of an offense in order to permit the matter to go to the trier of fact.[10] When determining whether sufficient evidence was presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[11]
 {¶ 69} In the instant case, Miller was convicted of intimidation of a public servant and retaliation against a public servant. R.C. 2921.03(A) reads, in pertinent part:
 {¶ 70} "No person, knowingly and by force, by unlawful threat of harm to any person or property * * * shall attempt to influence, intimidate, or hinder a public servant, party official, or witness in the discharge of the person's duty."
 {¶ 71} In order to sustain a conviction on this charge, the jury was required to find that the state had proven that Miller acted knowingly. R.C. 2901.22(B) reads:
 {¶ 72} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person had knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 73} R.C. 2921.05(A) governs retaliation against a public servant and reads:
 {¶ 74} "No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against a public servant, a party official, or an attorney or witness who was involved in a civil or criminal action or proceeding because the public servant, party official, attorney, or witness discharged the duties of the public servant, party official, attorney, or witness."
 {¶ 75} Miller asserts the state failed to provide sufficient evidence to sustain his convictions, because Sylvia was not acting in her capacity as a public servant and was not even the caseworker assigned to his CSEA matter. Therefore, he claims the charges in the indictment were never proven with regard to Sylvia. We disagree.
 {¶ 76} Although it was King who authorized the CSEA investigation and it was Pantalone who subsequently acted as the caseworker in Miller's CSEA matter, it was Sylvia who initially alerted CSEA regarding Miller's employment status while acting in her capacity as a supervisor with the CSEA. At trial, Sylvia testified that Miller became aware of her part in the commencement of the CSEA investigation and, thus, escalated his recurring abusive and intimidating behavior against her and her family.
 {¶ 77} The state presented testimony from a number of witnesses. Although, as noted above, some of the testimony was not admissible, there was ample testimony regarding the heightened acrimony and frequent incidences of intimidating and retaliatory behavior on the part of Miller after he learned of the CSEA investigation. The credibility of such witnesses was a matter for the jury to decide.
 {¶ 78} Therefore, we conclude the state met its burden in providing sufficient evidence on the elements of each charge against Miller to sustain the convictions for intimidation of a public servant and retaliation against a public servant.
 {¶ 79} Miller's fourth assignment of error is without merit.
 {¶ 80} Miller's fifth assignment of error is:
 {¶ 81} "Defendant-appellant's convictions for intimidation of a public servant and retaliation against a public servant were against the manifest weight of the evidence."
 {¶ 82} "`In determining whether a verdict is against the manifest weight of the evidence, "* * * the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."'"[12]
 {¶ 83} In this exercise, appellate courts engage in a limited weighing of the evidence introduced at trial.[13]
 {¶ 84} We have previously determined that a new trial is in order in light of the evidentiary rulings by the trial court, which renders this assignment of error moot.
 {¶ 85} Miller's fifth assignment of error is moot.
 {¶ 86} Miller's sixth assignment of error is:
 {¶ 87} "The trial court erred to the prejudice of defendant-appellant by imposing a prison term, rather than community control sanctions."
 {¶ 88} In this assignment of error, Miller contends that the trial court should not have imposed a prison term because he had no felony record and had never served a prison term. Pursuant to the seriousness and recidivism factors enumerated in R.C.2929.12, Miller argues that he should have received a community control sanction rather than a prison term. We have previously determined that a new trial is warranted in the instant matter, which renders this assignment of error moot.
 {¶ 89} Miller's sixth assignment of error is moot.
 {¶ 90} Based on the foregoing, Miller's first, second, and third assignments of error are with merit; the fourth assignment of error is without merit; and the fifth and sixth assignments of error are moot. Thus, the judgment of the Portage County Court of Common Pleas is reversed, and the matter is remanded for proceedings consistent with this opinion.
Ford, P.J., O'Toole, J., concur.
[1] State ex rel. Kline v. Carroll, 96 Ohio St.3d 404,2002-Ohio-4849, at ¶ 27.
[2] State v. Doss, 8th Dist. No. 84433, 2005-Ohio-775, at ¶ 9.
[3] Id., citing State v. Mason (1998), 82 Ohio St.3d 144,157.
[4] State v. Barnes (2002), 94 Ohio St.3d 21, 27.
[5] Id.
[6] Evid.R. 401.
[7] Strickland v. Washington (1984), 466 U.S. 668, at paragraph two of the syllabus.
[8] Id.
[9] Compare State v. Murray, 11th Dist. No. 2003-L-045,2005-Ohio-1693, at ¶ 42, with State v. Shadoan, 4th Dist. No. 03CA764, 2004-Ohio-1756, at ¶ 16, and State v. Jones (2001),91 Ohio St.3d 335, 346.
[10] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[11] Id.
[12] (Emphasis in original and citations omitted.) State v.Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *14-15.
[13] State v. Thompkins (1997), 78 Ohio St.3d 380, 387-388.